UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:25-CR-128-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **CRIMINAL INFORMATION** |
| | ) | |
| RANDAL FENTON WOOD | ) | |

The United States Attorney charges that at all relevant times:

## The Medicare Program

1.    The Medicare Program (Medicare) was a federal health insurance program, affecting commerce, that provided benefits to persons who were 65 years of age and older or disabled. Medicare was administered by the United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services.

2.    Medicare was a "health care benefit program" within the meaning of Title 18, United States Code, Section 24(b) and a "federal health care program," as defined by Title 42, United States Code, Section 1320a-7b(f).

3.    Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was assigned a unique Medicare identification number.

4.    As part of the Medicare enrollment process, health care providers ("providers") who provided items or services to beneficiaries

submitted enrollment applications to Medicare. The Medicare provider enrollment application, CMS Form 855B, required a provider, or an authorized representative of the provider, to certify that the provider would comply with all Medicare-related laws, rules, and regulations, including that the provider "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare" and "w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

5. If Medicare approved a provider's application, Medicare assigned the provider a Medicare provider number. A provider with a Medicare provider number could submit claims to Medicare to obtain reimbursement for medically necessary items and services rendered to beneficiaries. Medicare providers were given access to Medicare manuals and service bulletins describing procedures, rules, and regulations.

6. When seeking reimbursement from Medicare, providers submitted the cost of the items and/or services provided together with the appropriate code, as set forth in the Current Procedural Terminology Manual or the Healthcare Common Procedure Coding System.

7. Medicare included coverage under component parts. Medicare Part B covered, among other things, medical items that were reasonable and medically necessary.

## Durable Medical Equipment

8. Durable medical equipment ("DME") was reusable medical equipment such as orthotic devices and pneumatic compression devices ("PCDs"). Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces. PCDs were an inflatable garment with an accompanying electrical pneumatic pump that filled the garment with compressed air. DME was covered by Medicare under Part B.

9. Medicare would pay claims for the provision of DME only if the equipment was ordered by a licensed provider, was reasonable and medically necessary for the treatment of a diagnosed and covered condition, and was actually provided to beneficiaries. PCDs were medically necessary when prescribed to treat lymphedema or chronic veinous insufficiency with venous stasis ulcers. In addition to the required diagnoses, an unsuccessful trial of conservative therapy had to be documented in the beneficiary's medical records before prescribing any type of PCD. If the above requirements were not met, a claim for supplying a PCD was not eligible for reimbursement and Medicare would deny the claim as not reasonable and medically necessary.

10. Medicare prohibited DME suppliers from directly soliciting beneficiaries when supplying Medicare-covered items absent certain circumstances.

## The Defendant and Relevant Entities

11. The defendant, Randal Fenton Wood (WOOD), was the owner of Greenleaf Medical Supply, LLC (GMS) and Nevaeh & Company, LLC d/b/a Restorative Medical (NC-RCM), which were based in or near Winston-Salem, North Carolina. GMS and NC-RCM operated as DME supply companies, which submitted claims to Medicare for DME supplied to beneficiaries.

12. Dox Depot, LLC (Dox Depot) was a North Carolina limited liability company owned and operated by J.N., a resident of the Winston-Salem, North Carolina area. Dox Depot purported to provide marketing/call center services that generated "raw lead data" for DME suppliers.

13. Tri-Cities, LLC (Tri-Cities) was a North Carolina limited liability company owned and operated by J.N. that held itself out as a marketing company that sold doctors' orders for DME.

14. QHS, LLC was a North Carolina limited liability company owned and operated by J.N. that provided billing services for companies submitting claims to Medicare and other health care benefit programs.

15. In addition to founding and operating his own companies to bill Medicare for unnecessary DME, WOOD helped others do the same.

16. J.F. was a resident of Wake Forest, North Carolina. J.F. was the owner of London Medical Supply LLC, Harp Medical Supply LLC, and Advanced Rehab Technologies, LLC. These entities were limited liability companies incorporated in North Carolina, and operated as DME supply

companies. They submitted claims to Medicare for DME supplied to Medicare beneficiaries. WOOD helped J.F. enroll some of these businesses with Medicare and helped J.F. replicate the same business model utilized by WOOD.

17. M.R. was the owner of Magnolia Healthcare, LLC d/b/a Therapeutic Healthcare (Magnolia) and Bluewater Healthcare, LLC (Bluewater). Magnolia and Bluewater were limited liability companies incorporated in Louisiana, which operated as DME supply companies. Magnolia and Bluewater also submitted claims to Medicare for DME supplied to Medicare beneficiaries. WOOD helped M.R. enroll these businesses with Medicare and helped M.R. replicate the same business model utilized by WOOD.

### The Conspiracy

18. It was a purpose of the conspiracy for WOOD, J.N., J.F., and M.R. to unlawfully enrich themselves by: (a) shipping and delivering medically unnecessary DME to Medicare beneficiaries; (b) routinely waiving required copayments on DME shipped to Medicare beneficiaries and reimbursed by Medicare; (c) submitting and causing the submission of false and fraudulent claims to Medicare, including for items purportedly rendered to beneficiaries located in the Eastern District of North Carolina and elsewhere; (d) receiving and obtaining the reimbursements paid by Medicare based on the false and fraudulent claims submitted; (e) concealing the

submission of false and fraudulent claims to Medicare; and (f) diverting proceeds of the fraud for the personal use and the benefit of the Defendant and his co-conspirators.

19. The manner and means by which WOOD and his co-conspirators sought to accomplish the objects and purpose of the conspiracy, included, among other things:

a. The fraudulent orders for DME, including but not limited to PCDs, were based on information derived from telemarketing and in-person solicitations of beneficiaries. Dox Depot and Tri-Cities contracted with telemarketing and other companies to purchase the beneficiary information gained through the solicitations and generated doctors' orders for DME, which they sold to the aforementioned DME supply companies associated with WOOD, J.F., and M.R. The representatives from these telemarketing companies, who had no medical training, obtained the beneficiaries' names, unique Medicare identification numbers, and medical history, which Dox Depot and Tri Cities, in turn, used to populate the DME orders.

b. In marketing PCDs the call center representatives would often simply ask beneficiaries if they had pain or swelling in their legs. The call center representatives would not ask questions regarding diagnoses for lymphedema or chronic veinous

insufficiency with ulcers nor have any discussion of whether the beneficiaries were unresponsive to other clinical treatment as required by Medicare.

c. The call center representatives would also assure Medicare beneficiaries that the DME would be "at no cost" to them, even though Medicare regulations require the collection of copays. In turn, the DME companies owned by WOOD, J.F., and M.R. declined to collect copays, knowing that beneficiaries would be more likely to decline the DME if they incurred out-of-pocket costs. The promises not to collect copays for the purpose of inducing beneficiaries to agree to receive DME violated Medicare rules codified at Title 42, United States Code, Section 1320a-7b(b).

d. WOOD, J.F., and M.R. nevertheless purchased the pre-populated doctors' orders for DME from Dox Depot and Tri-Cities, which formed the basis of the fraudulent billing.

e. Further, WOOD, J.F., and M.R. developed and implemented a "doctor chase" model in order to deceive and pressure physicians into signing the DME orders and supporting documentation. To effectuate the "doctor chase," employees of the aforementioned DME supply companies who reported to WOOD, J.F., and M.R., persistently and aggressively faxed the DME orders, along with

purported "certificates of medical necessity," to a beneficiary's primary care physician until the physician completed the forms. The forms often contained false and misleading language, including that the beneficiary had "requested" the PCDs in order to "help them overcome the discomfort they experience during their day-to-day activities," in order to make the forms appear legitimate, even though the statements were often untrue.

f. Upon receipt of the signed DME orders and false certificates of medical necessity from the beneficiaries' primary care physicians, WOOD and his co-conspirators directed QHS to submit false and fraudulent claims to Medicare for the medically unnecessary DME on behalf of GMS and NC-RCM.

20. In total, the DME supply companies owned by or affiliated with WOOD received over $39 million in reimbursement from Medicare for DME ordered through the aforementioned scheme.

## THE CHARGE

21. The United States Attorney realleges and incorporates by reference herein all of the allegations contained in the preceding paragraphs of this Criminal Information, and further alleges that RANDAL FENTON WOOD, J.N., J.F., M.R., and others known and unknown to the United States

Attorney, carried out the conspiracy in the manner and means as set forth in those paragraphs.

22. Beginning at a time unknown, but no later than January 2019, and continuing through around December 2023, both dates being approximate and inclusive, in the Eastern District of North Carolina and elsewhere, the Defendant, RANDAL FENTON WOOD, and others known and unknown to the United States Attorney, did combine, conspire, confederate, agree, and have a tacit understanding with each other to commit offense against the United States, that is, to knowingly execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), namely, Medicare and other health insurers, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money owed by, and under the custody and control of, Medicare and such other insurers, in connection with the delivery of and payment for health care benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

All in violation of Title 18, United States Code, Section 1349.

## Notice of Forfeiture

Notice is hereby given that all right, title and interest in the property described herein is subject to forfeiture.

Upon conviction of any Federal health care offense as defined in 18 U.S.C. § 24(a), the defendant shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the said offense.

The forfeitable property includes, but is not limited to, the following:

Forfeiture Money Judgment:

a) A sum of money representing the gross proceeds of the offense(s) charged herein against RANDAL FENTON WOOD, in the amount of at least $9,141,603.47

If any of the above-described forfeitable property, as a result of any act or omission of a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of

any other property of said defendant up to the value of the forfeitable

property described above.

DANIEL P. BUBAR
Acting United States Attorney

BY

DAVID G. BERAKA
Assistant Unites States Attorney